**LOWENSTEIN SANDLER LLP**

_____

65 Livingston Avenue
Roseland, New Jersey 07068
973.597.2500
*Attorneys for Plaintiff*
    *Vicor Tax Receivables, LP*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>FALCI, Vincent P. and Donna M.,<br><br><br>     Debtors. | Chapter 7<br>Case No.: 17-12054 (MBK) |
| VICOR TAX RECEIVABLES, LP,<br><br>        Plaintiff,<br><br>v.<br><br>VINCENT P. FALCI,<br><br>        Defendant. | Adv. Pro. No.: |

**COMPLAINT OBJECTING TO DEBTOR'S DISCHARGE**
**AND TO THE DISCHARGEABILITY OF DEBTOR'S DEBTS**

Plaintiff, Vicor Tax Receivables, LP, by way of complaint against defendant, Vincent P. Falci ("Defendant" or "Debtor"), respectfully says:

**PARTIES, JURISDICTION AND VENUE**

1.      Plaintiff, Vicor Tax Receivables, LP, f/k/a Pantheon Tax Receivables, LP ("Vicor" or the "Fund"), is a Delaware Limited Partnership with a business address at 115 Route 46 West, Building F, Mountain Lakes, NJ 07046.  Vicor is a creditor of the Debtor who is owed millions of dollars due to the theft and concealment of Vicor's funds as of the date of the Debtor's bankruptcy filing, as described in detail below.

2.      Defendant, Vincent P. Falci ("Falci"), along with his Co-Debtor and wife, Donna M. Falci are individuals residing in Middletown, New Jersey.  Defendant and his wife filed a joint voluntary petition under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") on February 1, 2017 (the "Petition Date").

3.      On September 22, 2016, Vicor filed a complaint against Falci, Vincent N. Falci ("Falci, Jr.") and Saber Funds Distributors, LLC in the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-2116-16.

4.      This is an action objecting to the Debtor's discharge pursuant to section 727(a)(2), (a)(3), (a)(4), and (a)(5) of the Bankruptcy Code and objecting to the dischargeability of Debtor's debt to Vicor pursuant to sections 523(a)(2), (a)(4) and (a)(6) of the Bankruptcy Code.

5.      This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

6.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J).

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## FACTS

### I.      BACKGROUND

8.      Vicor is an investment fund formed by Falci to invest in property tax lien certificates issued by state and local taxing authorities throughout the United States.  Until December 26, 2016, Vicor was managed by its then general partner, Vidon Capital Partners, LLC ("Vidon").  On December 26, 2016, Viper Capital LLC, a Delaware limited liability company was substituted in as general partner, taking the place of Vidon, pursuant to a Substitution of General Partner of that date.  The investors in the Fund are Vicor's limited partners, as well as equity holders in a Vicor "sub-fund".

9.      At Vidon's inception, in or around August 2011, until on or about October 1, 2015, Vidon was controlled by Falci, who owned a 60% interest in Vidon, and Falci, Jr., who

owned a 40% interest in Vidon.

10.     Tax liens are issued by local taxing authorities and sold to the public when property owners fail to pay property taxes.  Generally, the tax lien purchaser pays the outstanding tax liability and obtains a first priority lien against the property.  If the property owner, or other interested party, does not pay the tax lien holder the back taxes plus interest after a certain amount of time, as set by statute, the tax lien holder can foreclose upon the property.

11.     Vicor was launched in January 2012.  However, Falci began seeking investors in Vicor as early as September 2011.  A September 2011 Confidential Private Offering Memorandum (the "Offering Memorandum") provided to potential investors described, among other things, Vicor's structure and investment strategy.

12.     The Offering Memorandum explained that "[t]he Fund's strategy will be to acquire tax lien certificates which will have a high likelihood of redemption and an attractive lien to value ratio.  To make this assessment, the principals of the General Partner conduct extensive due diligence with respect to the payment history of the property securing the lien." The Offering Memorandum identified Falci as the "managing member and principal" of the General Partner, Vidon.

13.     As was also explained in the Offering Memorandum, Vicor formed various Special Purpose Entities ("SPEs") domiciled in each of the states where Vicor was purchasing tax liens for the purpose of purchasing the liens.  The SPEs are single-member LLCs with Vicor as the sole member for each.  The names of the SPEs are Apollo, Vulcan, Saturn, Vesta, Ceres, Neptune, Juno, and Janus.

14.     On or about December 14, 2011, Vicor retained Apex Fund Services (US), Inc. ("Apex") to act as a third-party administrator for Vicor.  The terms of Apex's retention as administrator were set forth in a December 14, 2011, Administrator, Registrar and Transfer Agent Agreement (the "Apex Administrator Agreement").

15.     Pursuant to the terms of the Apex Administrator Agreement, Apex's duties as third-party administrator included, among other things:

a)     At Vidon's direction, to make and receive payments to and from Vicor's bank accounts;

b)     Determining management and performance fees and the net asset value ("NAV") of the Fund;

c)     Assisting Vidon in "lias[ing] with the Fund's banks, brokers and custodians" and "check[ing] the accuracy and reasonableness of confirmations" relating to fund transfers and expenses;

d)     Tracking and administering Fund subscriptions and redemptions;

e)     "[K]eeping the accounts and records of the Fund" and preparing and providing to investors statements, checks, and other documents Vidon is required to provide;

f)     Preparing monthly and annual financial statements for the Fund in accordance with generally accepted accounting principles;

g)     Maintaining a register of investors; and

h)     Providing Vicor accounting records on a monthly basis showing the value of the investors' investments.

16.    In a marketing presentation (the "Investor Presentation") created and distributed to potential investors by Falci, Falci represented that Apex would control all of the funds invested in Vicor, placing those funds beyond the reach of Falci. Specifically, the Investor Presentation represented that Vicor's holding account, where "initial subscription capital" was held, and its operating account, which was funded with investor capital and a Capital One line of credit (the "LOC"), were both "exclusively controlled by Apex." Thus, according to the Investor Presentation, "[Vicor] never has access to investor funds."

17.    In an October 2011 email, Apex Managing Director Vincent Sarullo stated that "bank accounts are set up for the funds with Apex having ALL control over monies. The fund managers ONLY make the lien acquisitions. … Essentially, the fund managers never touch the monies." Several initial Vicor investors were shown and relied upon this email.

18.    In or about January 2012, Vicor, several of the SPEs, and Capital One, National Association, entered into a Custodial Agreement (the "Custodial Agreement") whereby Apex agreed to, among other things, hold certain tax liens purchased by the SPEs, which tax

liens served as collateral for the LOC, as custodian.  Apex also agreed to gather and maintain "all material information concerning the purchase of such Tax Lien and information about the property securing the Tax Lien and each Tax Debtor" and to provide such information to Vicor and Capital One.

19.    In raising investment capital for the Fund, Falci touted his experience both in the field of investment management generally, and with regard to investing in tax liens in particular.  Falci also highlighted his affiliation with a group of investment funds known as the Saber Funds.

20.    The Offering Memorandum included a biography of Falci, which highlighted his role as "Managing Director and founder of Saber Funds."  It read, "[i]n the early 2000's, Mr. Falci brought his passion for protecting and growing his clients' assets to new heights with the creation of Saber Funds.  His knowledge as a financial advisor became invaluable as he developed a company that functioned on a solitary principle that [] great returns need not be achieved at great risk.  With this guiding tenet, Saber Funds became a forerunner in the alternative investment world of tax lien certificates."

21.    The Investor Presentation contained similar biographical information about Falci and his background.  It touted Falci's "15 years investment management experience" and "10 years tax lien acquisition experience."  The presentation claimed that Falci was a "tax lien consultant for investment advisory firms" and noted that he "founded Saber Funds LLC in 2005."

22.    Neither the Offering Memorandum nor the Investor Presentation disclosed the fact that Falci and Falci, Jr., were being investigated by the New Jersey Bureau of Securities regarding their involvement with and operation of the Saber Funds.

23.    Following the Fund's January 2012 launch, Vicor continued to admit new investors over the course of the next several years.

24.    Vicor's audited financial statements, prepared by Cowan, Gunteski & Co., P.A., at year-end 2012, 2013, and 2014 reflected investors' capital of $3,456,017, $7,960,323,

and $17,546,515 respectively.  By the fall of 2015, the Fund had a purported NAV of approximately $20 million, although a significant portion of that total consisted of fabricated assets and falsified gains.  As it turns out, a substantial portion of the capital invested in Vicor was stolen by Falci and/or his web of companies, agents, and co-conspirators (together, the "Falci Enterprise") and diverted to, among others, Saber Fund Distributors, LLC ("Saber Distributors") which in turn, on information and belief, distributed stolen funds to Saber Funds' investors whom Falci would ultimately admit to defrauding.

## II.     THE SABER FUNDS CONSENT JUDGMENT

25.     As Falci had touted in the materials he used to market Vicor to potential investors, Falci founded Saber Funds, LLC ("Saber Funds"), along with various affiliated entities, in 2005.

26.     On or about September 18, 2014, the New Jersey Attorney General, Bureau of Securities, brought a civil lawsuit (the "NJ-AG Action") against Falci, Saber Funds, Saber Distributors, several other affiliated funds and entities (the "Saber–Affiliated Entities")[1], and, nominally, against Falci, Jr., and Falci's wife and co-debtor, Donna Falci.

27.     The NJ-AG Action included claims against Falci for violating New Jersey securities laws by, among other things, making false and misleading statements to Saber Funds investors in connection with their purchase of securities, defrauding Saber Funds investors, acting as an agent without registration, and selling unregistered securities.

28.     In addition to fraudulently raising funds through the sale of unregistered securities, the NJ-AG Action alleged that Falci misled investors as to how the funds would be used, and instead diverted the funds to his own benefit.  In particular, the NJ-AG Action alleged that Falci "misrepresented to investors that investor money would be invested primarily in tax lien certificates …" and that "investor funds were used to, among other things, purchase several

---

[1] The "Saber-Affiliated Entities" are Saber Asset Management, LLC, Fixed Term Government Fund, LLC, MSI Fund I, LLC, MSI Equity Fund II, LLC, BWX Fund, LLC, and Preferred Income Portfolio I, LLC.

residences for defendant Falci and his wife, … conduct day-trading by defendant Falci and his son, … and make loans totaling $185,000.00 to a company owned by defendant Falci's best friend."

29.    The NJ-AG Action sought (1) to provide Saber Funds investors with the option to have their investments refunded, (2) disgorgement by the defendants, (3) civil penalties, and (4) an injunction preventing Falci, along with the other defendants, from "engaging in the securities business in New Jersey in any capacity" and from selling, offering to sell, or promoting any securities from or within New Jersey.

30.    On September 18, 2015, the Superior Court of New Jersey entered a Consent Order and Final Judgment as to all defendants and nominal defendants in the NJ-AG Action (the "Consent Judgment").

31.    The Consent Judgment contained detailed findings of fact, which Falci and his co-defendants admitted to by executing the Consent Judgment and agreeing to its entry, including findings that:

a)    "From January 2006 through at least December 2009, Falci … fraudulently raised over $6.7 million from the sale of unregistered securities in the form of interests in limited liability companies and investment contracts from approximately 182 investors …."

b)    "Falci … created, operated and exclusively controlled and continues to control" Saber Funds, Saber Distributors, and the Saber-Affiliated Entities.

c)    Falci handled the day-to-day management of, made all investment decisions for, and controlled the finances of Saber Funds, Saber Distributors, and the Saber-Affiliated Entities.

d)    Falci, Saber Funds, Saber Distributors, and certain of the Saber-Affiliated Entities "made materially false and/or misleading statements" to Saber investors "including that: (i) their money would be invested primarily in tax lien certificates; and (ii) in 2005, such investments yielded a 7.24% rate of return." In fact, no more than 3% of the total assets under management of Saber's investment funds were invested in tax lien certificates at any given time and the referenced returns were purely hypothetical.

e)   Prospective investors in the Saber-Affiliated Entities were provided with private placement memoranda (the "Saber PPMs") setting forth the purposes and strategies of the various funds. Falci either drafted himself or was "heavily involved in drafting" the various Saber PPMs.

f)   The Saber PPMs represented that the investment objective of the funds was to seek interest income primarily through investing in tax lien certificates and other fixed income instruments, and that "the funds contemplated investing most of their capital in tax lien certificates …."

g)   Saber Distributors, through Falci, falsely represented to Saber investors in an annual written update in or around December 2008 that 85%-90% of funds were invested in tax lien certificates when, in fact, that number was never above 3%.

h)   Falci transferred more than $1 million in investor funds to himself, Falci, Jr., and his wife, and transferred approximately $554,000 to Phoenix Equities, an entity Falci controlled, which Falci and Falci, Jr., used for personal day trading.

i)   Falci transferred approximately $3 million in investor funds to Hallus Realty, an entity he controls, which was subsequently used to purchase at least seven properties, which were initially deeded in Falci's and/or his wife's names.

j)   At the time the Consent Judgment was entered, two of the properties purchased with Saber investor funds had been sold and five were still owned by the Falcis and/or Hallus Realty. Each of the five were encumbered by mortgage loans and leased to residential tenants, including one that was leased to Falci.

k)   Falci caused certain of the Saber-Affiliated Entities to extend lines of credit to Phoenix Equities and Hallus Realty, and Falci caused Saber Funds to loan $185,000 to a company owned by an individual Falci referred to as his "best friend." These loans were not disclosed to investors.

32.   The Consent Judgment also contained conclusions of law, including that Falci, Saber Funds, and Saber Distributors (a) "violated the antifraud provisions of the [New Jersey] Securities Law," (b) "sold unregistered securities in the form of limited liability company interests and investment contracts," and (c) "acted as an agent without registration, in violation of" New Jersey securities laws.

33.   The Consent Judgment permanently enjoined (the "Injunction") Falci from "engaging in the securities business in New Jersey in any capacity, from selling, offering for sale, or promoting any securities," and from "acting as an officer and/or director if an issuer … or from owning or controlling a majority interest in any issuer that offers and/or sells any security." The Injunction also expressly barred Falci from raising capital, managing or exercising control over investments and assets, and engaging in investor communications for or on behalf of Vidon and Vicor.

34.   In addition to the Injunction, final judgment was entered against Falci, Saber Funds, Saber Distributors, and certain of the Saber-Affiliated Entities in the amount of $7,542,697.57, representing $6,742,697.57 in restitution and $800,000.00 in civil monetary penalties. The Consent Judgment requires that payment of the final judgment amount be made directly to the New Jersey Bureau of Securities according to a schedule set forth in the Consent Judgment, with the initial payment on August 31, 2016, subsequent payments on August 31 through 2019, and a final payment on September 15, 2020. On information and belief, Falci failed to pay the first installment due on August 31, 2016.

III.   **FALCI RELINQUISHES CONTROL OF VIDON AND APEX RESIGNS**

35.   Because the Injunction expressly prohibited Falci from managing Vidon and/or Vicor, Falci was required to relinquish control of Vidon after entry of the Consent Judgment.

36.   In order to do so, Falci and Falci, Jr., who were the only members of Vidon at that time, entered into a Membership Interest Purchase Agreement (the "MIPA"), dated October 1, 2015, whereby Clifford Andrews ("Andrews") obtained a 40% membership interest in Vidon and Robert Gartner ("Gartner") acquired a 30% membership interest in Vidon. Pursuant to the MIPA, Falci retained a 20% interest, and Falci, Jr., retained a 10% interest in Vidon.

37.   Following the entry of the Consent Judgment, Apex notified Vidon of its intent to terminate the Apex Administrator Agreement and the Custodial Agreement and to no

longer serve as administrator or custodian for Vidon and Vicor.

38.     On or about October 1, 2015, Vidon retained Tower Fund Services, LLC ("Tower") as Vicor's fund administrator, replacing Apex.  Tower was subsequently retained as custodian, replacing Apex, on December 18, 2015.

## IV.     ANDREWS AND GARTNER DISCOVER FALCI'S THEFT AND FRAUD

39.     After Andrews and Gartner acquired their membership interests in Vidon, and Tower took over for Apex as administrator and custodian, information began to emerge regarding Vicor's finances and balance sheet.

40.     For example, shortly after taking over for Apex, Tower identified a large line-item listed as an asset on Vicor's balance sheet entitled Investments in Advance account ("IIA Account").  The IIA Account is a way of reflecting monies that have been designated for imminent investment, such as funds deposited with a local taxing authority in advance of an upcoming tax lien certificate sale, or recently purchased assets that have not yet been added to Vicor's inventory management system.

41.     The initial balance sheet provided to Tower by Apex listed IIA Accounts in excess of $3 million.

42.     Tower quickly requested that Falci explain why the IIA Account figures were so large and where the IIA Account assets were located.

43.     Falci failed to provide a satisfactory explanation to Tower regarding the IIA Accounts.  Falci also has failed to produce backup for other balance sheet items to Tower. As a result, Tower has not provided Vicor investors with an NAV report, which is typically provided on a monthly basis, since March 2016, when it provided an NAV for January 2016.

44.     During the first quarter of 2016, certain Vicor investors expressed a desire to redeem the invested funds and establish two separate tax lien investment funds – one to be established by Andrews and Gartner, and another to be established by certain other Vicor investors.

45.     On March 23, 2016, Andrews and Gartner, on behalf of Vidon, sent a

letter to Vicor investors explaining that Vidon had determined it was in Vicor's interests to dissolve the Fund and liquidate and distribute its assets to investors.  The letter explained that the Fund's dissolution would take an estimated 30-60 days.  Investors were given the option of (1) accepting a direct distribution from the Fund, (2) directing their interest in Vicor to be transferred to a tax lien fund to be established by Andrews and Gartner, or (3) directing their interest to be transferred to a tax lien fund to be established by certain other Vicor investors.

46.     Leading up to that letter, Andrews and Gartner had met with Falci repeatedly to discuss Vidon's and Vicor's operations and finances.  As set forth more fully below, Andrews and Gartner have since learned that Falci lied to them.  Falci also stonewalled their attempts to gain access to Vidon's records.

47.     Following Vidon's decision to dissolve the Fund, and despite Falci's obstruction, Andrews and Gartner were able to uncover extensive misconduct and misappropriation of monies perpetrated by the Falci Enterprise through the records to which they were able to gain access as well as the review of publicly available information.

### A.     Overpayments From Vicor to Vidon

48.     A preliminary review of Vicor's records from its accounts from February 2, 2015 until approximately April 13, 2016 has revealed that Falci directed at least $1.8 million in overpayments to Vidon above and beyond even the most conservative estimate of funds to which Vidon would have been entitled over the same period.  While Falci hindered Vidon's ability to access its account records during this preliminary review, it appears that Falci and/or the Falci Enterprise moved such money out of Vidon's accounts to advance their illicit scheme.

49.     For example, Vicor's bank statements from February 2, 2015 until April 13, 2016 show transfers from Vicor to Vidon totaling $2,994,283.  These transfers were all initiated by or at the direction of Falci.

50.     Vidon would be entitled to reimbursement of *bona fide* expenses paid on the Fund's behalf as well as to a monthly servicing fee and, if applicable, a performance fee as

set forth in Vicor's Limited Partnership Agreement. However, Vidon's *bona fide* reimbursable expenses for the period February 2, 2015 until April 13, 2016 were no more than $213,042.60, and most likely significantly less.

51.    Over the same period, the maximum combined service fee and performance fee due to Vidon would have been $934,509.69. Because the servicing fee and performance fee due to Vidon are percentages of the total assets under management and the Fund's investment gains respectively, both fees rely on an accurate calculation of the Fund's assets and performance. Because Falci's theft and fraud have resulted in overstated financial statements, this figure for fees is grossly overstated. Vicor has been unable to determine the actual fees that were due to Vidon over this period, however, because of Falci's efforts to conceal his actions.

52.    Per the above, the maximum in fees and reimbursements to which Vidon could have been entitled over this period would have been $1,147,552.29, although the actual amount is much lower.

53.    Thus, of the $2,994,283 in transfers outlined above, Falci transferred at least $1.8 million to Vidon, to which it was not entitled, from February 2, 2015 through April 13, 2016 alone and Falci then depleted Vidon of those monies.

54.    The Vidon accounts to which Falci made these improper transfers are now closed and emptied of all funds. None of the improperly transferred funds have been recovered by Vicor.

**B.    Transfers to HRG Asset Recovery**

55.    From August 13, 2015 through June 2016, Vicor made payments totaling $759,005 to an entity known as HRG Asset Recovery, LLC ("HRG"). All of the payments were initiated by or at the direction of Falci.

56.    When asked about HRG by Andrews and Gartner, Falci falsely told Andrews and Gartner that HRG was owned by Vicor's lien agent in Georgia, Philip Cope

("Cope").   Falci falsely claimed that the transfers were made to HRG in order to purchase redeemable deeds[2] in Georgia for Vicor.

57.    In fact, as the subsequent investigation revealed, HRG is a Delaware limited liability company solely owned by Falci.

58.    In April 2016, Andrews and Gartner located a copy of HRG's Certificate of Formation on a server owned and maintained by Vidon.   By May 2016, however, the Certificate of Formation had been deleted from the server by Falci.

59.    As set forth below, many of the Georgia redeemable deeds reflected in Vicor's books are fictitious.

60.    Upon information and belief, Falci established HRG to divert Vicor assets as purported payments for fictitious redeemable deeds in Georgia and, after making such payments to HRG, converted the transferred funds to his own use.

## C.    Fictitious Georgia Redeemable Deeds

61.    Vidon's investigation revealed that 41 redeemable deeds included on Vicor's balance sheet, with a total value of $2,710,449, are fictitious (the "Fictitious Deeds").

62.    In reviewing Vicor's books as part of the investigation, Vidon requested and received from Cope, Vicor's lien agent in Georgia, a list of all of the Georgia redeemable deeds held by Vicor.

63.    The list of Georgia redeemable deeds provided by Cope contained 41 fewer redeemable deeds than were reflected on Vicor's balance sheet.

64.    After confirming that Cope had no record of Vicor's ownership of the Fictitious Deeds, Gartner contacted local officials in Georgia and reviewed public property records to confirm that Vicor did not own redeemable deeds on the properties for which the Fictitious Deeds were purportedly sold.   Gartner's contacts with local officials coupled with

---

[2] For purposes of this Complaint, "redeemable deeds" are functionally equivalent to tax liens in that they are sold at auction to obtain payment of outstanding property taxes and the property owners may redeem the instruments by paying the back taxes plus a penalty to the holder.

review of public records confirmed that the Fictitious Deeds were, in fact, fabricated.

65.     All of the Fictitious Deeds were entered into Vicor's lien tracking database, called VADAR, by Falci.  Falci's falsification of the Fictitious Deeds has resulted in the material misstatement of assets on Vicor's balance sheet.

66.     In particular, Vicor's balance sheet falsely reflects that Vicor purchased the Fictitious Deeds for $2,227,189, that those deeds have accrued $453,645 in interest and penalties, and that $29,615 in expenses were allocated to the Fictitious Deeds.  The actual value of the Fictitious Deeds is zero.

## D.    Diversion of Funds Through Coleman Realty Group to Vidon and Saber Distributors

67.     Falci has diverted at least $1,794,940 through an account used to transfer funds to Vicor's Georgia lien agent, Coleman Realty Group, Inc. ("CRG"), to both Vidon and Saber Distributors.

68.     The CRG account has been used to effectuate purchases of liens and payments of bona fide expenses on Vicor's behalf.

69.     However, a review of the limited records currently available to Vicor has revealed that Falci repeatedly transferred excess funds to the CRG account under the guise of purchasing liens and then transferred those excess funds back to Vidon and Saber Distributors, which were controlled by Falci.

70.     As an example of one such transaction, on March 6, 2015, CRG received a transfer of $250,000 from Vicor and, that same day, transferred $250,000 to Saber Distributors, an entity that played no role in Vicor's tax lien investments.

71.     As set forth above, Falci diverted nearly $1.8 million in Vicor's funds to entities he controlled through the CRG account.

## E.    The IIA Account

72.     Vicor's balance sheet currently reflects a $3.9 million balance in the IIA Account which, as set forth above, should only reflect temporary balances of funds designated

for imminent investment or recently-acquired investments that have not yet been booked in Vicor's inventory management system.

73.     Despite repeated requests from both Tower and Vidon, Falci has failed to account for the $3.9 million IIA Account balance.

74.     Upon information and belief, Falci used the IIA Account as a means of hiding funds that he misappropriated from Vicor.

75.     Upon information and belief, all or substantially all of the IIA Account balance reflects funds that Falci has misappropriated from Vicor under the guise of purchasing tax liens or paying other legitimate expenses.

76.     By booking the misappropriated money as an asset in the IIA Account, Falci was able to make it appear as though there was no loss in the value of the Fund.

77.     Because the funds reflected in the IIA Account were, upon information and belief, transferred to entities controlled by Falci, the $3.9 million recorded as being in the IIA Account should not be reflected as an actual asset on Vicor's balance sheet.

**F.      Diversion of Funds to Saber Distributors to Reimburse Saber Funds Investors**

78.     Upon information and belief, Falci has used millions of dollars in funds he misappropriated from Vicor to repay the Saber Funds investors.

79.     As set forth above, a portion of the funds diverted through the CRG account were transferred directly to Saber Distributors.

80.     In addition, upon information and belief, monies that Falci initially transferred either to himself, to Vidon, or to other members of the Falci Enterprise, were subsequently transferred by Falci to Saber Distributors and ultimately distributed to Saber Funds investors.

81.     Despite the fact that Saber Distributors had little cash or liquid assets, a review of records available to Vidon in its investigation revealed that Saber Distributors has distributed as much as $5 million or more to Saber Funds investors since approximately the

middle of 2015.

82.     As Saber Distributors is owned and controlled by Falci, Saber Distributors received the funds misappropriated through Falci's various schemes, with the knowledge that the funds rightly belonged to Vicor and its investors.

## V.     FALCI'S VIOLATION OF THE NJ-RICO STATUTE

83.     Falci violated the NJ-RICO statute, N.J.S.A. §§ 2C:41-2(c) and (d) and 2C:41-4, by conducting, and by conspiring with others to conduct, the affairs of an enterprise through a pattern of racketeering activity in violation of N.J.S.A. 2C:41-2(c) and (d).

84.     Specifically, Falci engaged in systematic, intentional acts of theft and falsification of records, along with other criminally deceptive conduct, through an enterprise comprised of entities and individuals described above and below to comprise the Falci Enterprise, including but not limited to Falci, Falci, Jr., HRG, Saber Funds, Saber Distributors, and the Saber-Affiliated Entities, working together to enrich the enterprise at the expense of Vicor.  Vicor was injured as a direct result of Falci's conduct of the Falci Enterprise through a pattern of racketeering activity.

### A.     The Enterprise

85.     The Falci Enterprise was an enterprise within the meaning of N.J.S.A. § 2C:41-1(c).  It consisted of a number of individuals and business entities working in tandem to enrich themselves at Vicor's expense, including the following:

a)     Defendant Falci orchestrated and executed the scheme, with the assistance of the other members of the Falci Enterprise, by embezzling funds from Vicor, falsifying records to conceal the embezzlement, and conspiring with, directing and utilizing the other Falci Enterprise members to assist in the scheme to embezzle Vicor funds and conceal the embezzlement.

b)     Saber Distributors conspired with Falci and accepted and concealed the funds embezzled from Vicor, distributing those funds to investors in the Saber Funds and the Saber-Affiliated Entities in order to avoid negative consequences for both Falci and Saber Distributors that could result from failure to abide by the

terms of the Consent Judgment.

c)     HRG accepted embezzled Vicor funds and conspired with and assisted Falci in concealing the embezzled funds and their ultimate disposition.

d)     Falci, Jr., upon information and belief, conspired with and assisted Falci, as a 40% member in Vidon, in embezzling funds from Vicor and concealing the embezzled funds in order to gain a monetary benefit and in order to avoid negative consequences that could result from failure to abide by the terms of the Consent Judgment.

e)     Saber Funds and the Saber-Affiliated Entities, admitted to violating antifraud provisions of the New Jersey Uniform Securities Law, and, upon information and belief, conspired with other members of the Falci Enterprise to receive funds stolen from Vicor and to distribute those funds to Saber Funds investors.

f)     Upon information and belief, additional unknown individuals and entities conspired with and assisted in conducting the affairs of the Falci Enterprise members set forth above.

86.     The members of the Falci Enterprise shared the common purpose of obtaining large-scale pecuniary gain through securities fraud, through the embezzlement of funds from Vicor, and through the concealment of that embezzlement.

87.     The Falci Enterprise was a sustained, well-developed operation organized for the purpose of defrauding investors, stealing from Vicor, and concealing that theft so that Vicor and its investors could not put an end to the theft. Each member of the Falci Enterprise played a distinct role in facilitating either the theft of Vicor funds, the concealment of that theft, or both.

## B.     The Racketeering Activity

88.     Falci conducted the affairs of the Falci Enterprise through a pattern of racketeering activity within the meaning of N.J.S.A. § 2C:41-1(a) and (d). In particular, in conducting the affairs of the Falci Enterprise, Falci committed, among other things, the following predicate acts of racketeering activity on numerous instances:

a)     Falci repeatedly committed acts of theft against Vicor in violation of, among other statutes, N.J.S.A § 2C:20-2 and 3(a) by unlawfully

exercising control over Vicor's property with the intent to deprive Vicor of its money. As set forth above, Falci has made numerous transfers of Vicor's funds to himself or to people or entities controlled by Falci for the purpose of stealing the funds.

b)      Falci repeatedly committed theft by deception, in violation of N.J.S.A. § 2C:20-4 by creating a false impression as to the value of the assets held by Vicor, resulting in his being paid improper and excessive service and performance fees calculated based upon Vicor's falsified records.

c)      Falci and Saber Distributors, along with the Saber-Affiliated Entities, violated the antifraud provisions of the New Jersey Uniform Securities Law, N.J.S.A. § 49:3-52(b) and (c), as they admitted in the Consent Judgment, by making false representations to Saber Funds investors in connection with the sale of securities.

d)      Saber Distributors repeatedly violated N.J.S.A. § 2C:20-7(a) by knowingly receiving Vicor's stolen money. As set forth above, on numerous and repeated occasions, funds stolen from Vicor were transferred to Saber Distributors, an entity controlled by Falci and which, therefore, had knowledge that the funds were stolen. As set forth above, Falci, Jr., upon information and belief, also received funds stolen from Vicor.

e)      Falci repeatedly violated N.J.S.A. 2C:21-4(a) by falsifying records with the intent to deceive Vicor and/or its investors as to the Vicor's financial condition and to conceal the Falci Enterprise's theft of Vicor's funds. In particular, and as described above, Falci did this by, among other things, (i) falsifying 41 redeemable deeds and falsely recording them as assets held by Vicor, and (ii) falsely booking $3.9 million under IIA Account on Vicor's balance sheet when, in fact, those funds were embezzled by Falci with the assistance of the Falci Enterprise.

f)      Falci violated the antifraud provisions of the New Jersey Uniform Securities Law, N.J.S.A. § 49:3-52(b), by making untrue statements of material fact in connection the sale of interests in Vicor. In particular, the Investor Presentation Falci distributed to potential Vicor investors wrongly stated that Vicor's holding and operating accounts were "exclusively controlled" by Apex and that "[Vicor] never has access to investor funds." In reality Falci was able at all times to access and misappropriate investor funds.

89.     As set forth at length above, Falci committed each of the above predicate acts on numerous occasions. As such, Falci's actions constituted a pattern of racketeering

activity pursuant to NJ-RICO.

C.    **Proximate Cause and Damages**

90.    Vicor has been damaged by Falci's conduct in operating the Falci Enterprise.  Vicor has been deprived of millions of dollars by Falci's theft and concealment of Vicor's funds.   In addition, the extent of Vicor's damages was increased by the Falci's concealment of his scheme both through the falsification of records and through other means.

91.    Pursuant to N.J.S.A. § 2C:41-4(c) Vicor is entitled to recover three times the amount of its damages that have resulted from Falci's violation of the NJ-RICO statute. Vicor is also entitled to recover attorneys' fees, costs of investigation, and costs of litigation.

## VI.    VICOR'S CLAIMS AGAINST FALCI, THE CRIMINAL CHARGES, AND THE FALCI BANKRUPTCY

92.    On September 22, 2016, Vicor filed a complaint (the "Vicor Complaint") against Falci, Falci, Jr., and Saber Distributors in the Superior Court of New Jersey arising from the above-described facts asserting claims for Breach of Fiduciary Duty, Violation of the New Jersey Uniform Fraudulent Transfers Act N.J.S.A. § 25:2-20, et seq., Conversion, Fraudulent Concealment, Unjust Enrichment, and violation of the NJ-RICO statute (the "State Court Action").

93.    On December 6, 2016, the Clerk of the Superior Court of New Jersey, Law Division, Morris County, entered default against Falci, Falci, Jr., and Saber Distributors.

94.    On December 16, 2016, The United States of America filed a criminal complaint against Falci, charging him with three counts of wire fraud and securities fraud arising from his theft from Vicor and securities fraud in connection with his administration of both Vicor and the Saber Entities.

95.    On February 1, 2017, Falci, along with his wife Donna Falci, filed a voluntary petition for bankruptcy protection pursuant to Chapter 7 of the United States Bankruptcy Code.

-19-

96.     On February 10, 2017, Falci filed several documents in the bankruptcy case including, among other documents, a summary of assets and liabilities, various schedules disclosing income, expenses, and property, and a statement of financial affairs (collectively, the "Falci Schedules").

97.     The Falci Schedules were inaccurate and incomplete in several material respects.  For instance, the Falci Schedules falsely state that Falci had $185,000 in income in 2015 and $47,000 in income in 2016 despite the fact that Falci embezzled millions of dollars from Vicor over that period.  When asked at his Creditors' Meeting about the money he embezzled from Vicor in 2015 and 2016 Falci declined to answer, citing his Fifth Amendment right to not be compelled to incriminate himself.

98.     As another example, the Falci Schedules contain a section where Falci purports to disclose every membership interest he has held in a limited liability company in the four years prior to filing his bankruptcy petition.  Falci concealed his ownership of HRG and did not disclose the same in the Falci Schedules.  When asked at his Creditors' Meeting whether this section of the Falci Schedules was accurate, Falci declined to answer, citing his Fifth Amendment right to not be compelled to incriminate himself.

## FIRST COUNT
### (11 U.S.C. §§ 727(a)(2), (a)(3), (a)(4) and (a)(5))

99.     Vicor repeats and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

100.    The numerous payments and transfers, including, but not limited to, the improper transfers to Vidon, the transfers to HRG Asset Recovery, the diversion of funds through Coleman Realty Group to Vidon and Saber Distributors, the improper use of the IIA Account, and the diversion of funds to Saber Distributors to reimburse Saber Funds investors, and all other transfers and payments set forth above, effect a transfer by Falci of one or more interests in property with actual intent to hinder, delay or defraud his creditors, including Vicor.

101.    Such intent is apparent from the following:  (a) the payments and transfers

were to insiders, including Falci's family members, who are subject to his influence and control; (b) Falci retained possession or control of the property transferred after the transfers; (c) Falci concealed and failed to disclose the payments and transfers; (d) the payments and transfers comprise a large portion of the assets of Falci's estate; and (e) Falci did not receive reasonably equivalent value for the payments or transfers.

102.    As set forth above, Falci concealed his theft and fraudulent transfer of Vicor's funds by falsifying documents and concealing evidence of same.

103.    Also as set forth above, Falci falsified the Falci Schedules by, among other things, omitting and concealing his income from the amounts he embezzled from Vicor and concealing his ownership of HRG, under penalty of perjury.

104.    Pursuant to Section 727 of the Bankruptcy Code, Falci is not entitled to discharge on the grounds that he has:

> a)    With intent to hinder, delay or defraud a creditor, has transferred, removed, or concealed, or has permitted to be transferred, removed, or concealed, property of the debtor and the estate;
>
> b)    Concealed or failed to keep books, documents, records and papers from which his financial condition or business transactions might be ascertained;
>
> c)    Knowingly and fraudulently making a false oath or account in connection with this bankruptcy case; and
>
> d)    Failed to satisfactorily explain his loss of assets or deficiency of assets to meet his liabilities.

## SECOND COUNT
### (11 U.S.C. § 523(a)(2))

105.    Vicor repeats and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

106.    As set forth above, Falci misappropriated Vicor's funds over the course of several years by transferring funds to entities owned and controlled by Falci.

107.        Falci concealed his misappropriation of funds by, among other

things:

    a)    Concealing and lying about his ownership of HRG;

    b)    Falsifying the Fictitious Deeds and entering them into Vicor's records management systems;

    c)    Routing certain transfers to himself or to entities controlled by him through CRG under the guise of purchasing tax liens;

    d)    Booking certain transfers to himself or to entities controlled by him under the IIA Account on Vicor's balance sheet; and

    e)    Impeding Vidon's access to books and records essential to investigating the nature and extent of his theft.

108.    Such acts require the denial of a discharge as to the debt Falci owes to Vicor under Section 523(a)(2) of the Bankruptcy Code.

## THIRD COUNT
### (11 U.S.C. § 523(a)(4))

109.    Vicor repeats and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

110.    At the time Falci was the managing member of Vicor's general partner, Falci owed Vicor fiduciary duties.

111.    As set forth above, Falci has embezzled millions of dollars from Vicor.

112.    Falci breached and is continuing to breach his fiduciary duties to Vicor by, among other things:

    a)    Misappropriating Vicor's funds and diverting them to Falci's own use and/or diverting them to people and/or entities controlled by Falci for Falci's benefit;

    b)    Falsifying entries in Vicor's books and records;

    c)    Disseminating false information regarding Vicor's assets and financial condition to Vicor's limited partners; and

    d)    Impeding Vidon's efforts to investigate Falci's malfeasance.

113.    Falci's conduct constituted a defalcation while acting in a fiduciary capacity or, alternatively, embezzlement or larceny, requiring denial of a discharge as to the debt he owes to Vicor under Section 523(a)(4) of the Bankruptcy Code.

## FOURTH COUNT
### (11 U.S.C. § 523(a)(6))

114.    Vicor repeats and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

115.    Falci caused injury to Vicor by willfully and maliciously misappropriating Vicor's funds and diverting them to his own use and/or to others controlled by Falci, thus depriving Vicor of its property rights.

116.    In light of Falci's actions and conduct described above, the debt owed by Falci to Vicor should be denied a discharge under Section 523(a)(6) of the Bankruptcy Code.

**WHEREFORE,** Vicor respectfully requests that the Court enter an Order: (1) fixing the amount of the Debtor's indebtedness to Vicor; (2) declaring that the amount determined to be owed by the Debtor constitutes a nondischargable debt pursuant to 11 U.S.C. 523; (3) denying the Debtor a discharge in bankruptcy pursuant to Section 727 of the Bankruptcy Code; and (4) granting Vicor such other and further relief as the Court deems just and proper.

Dated:     May 2, 2017

Respectfully submitted,

**LOWENSTEIN SANDLER LLP**
*Counsel to Vicor Tax Receivables, LP*

__/s/  Frank Catalina_____
Frank T.M. Catalina, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone:     973-597-2500
Facsimile:     973-597-2333